**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DSCC,
120 Maryland Avenue NE
Washington, DC 20002;

DCCC,
430 South Capitol Street SE
Washington, DC 20003;

DEMOCRATIC GOVERNORS ASSOCIATION,
1225 Eye Street NW, Suite 1100
Washington, DC 20005;

U.S. SENATE MINORITY LEADER CHARLES E. SCHUMER, Notice of address to be filed under seal pursuant to LCvR 5.1(c);

U.S. HOUSE OF REPRESENTATIVES MINORITY LEADER HAKEEM S. JEFFRIES, Notice of address to be filed under seal pursuant to LCvR 5.1(c),

Plaintiffs,

*v.*

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,
500 12th Street SW
Washington, DC 20536;

DAVID VENTURELLA, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement,
500 12th Street SW
Washington, DC 20536;

U.S. DEPARTMENT OF HOMELAND SECURITY,
2707 Martin Luther King Jr. Avenue SE
Washington, DC 20528;

MARKWAYNE MULLIN, in his official capacity as

Case No. 1:26-CV-3330

Secretary of Homeland Security,
2707 Martin Luther King Jr. Avenue SE
Washington, DC 20528;

FEDERAL BUREAU OF INVESTIGATION,
935 Pennsylvania Avenue NW
Washington, DC 20535;

KASHYAP PATEL, in his official capacity as Director of the Federal Bureau of Investigation,
935 Pennsylvania Avenue NW
Washington, DC 20535,

Defendants.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. In our democracy, the polling booth is meant to be "an island of calm in which voters can peacefully contemplate their choices." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 3 (2018).

2. To that end, federal law prescribes various measures to ensure that polling areas are places of repose that are free of intimidation. It prohibits any person, "whether acting under color of law or otherwise," from intimidating, threatening, or coercing any other person "for voting or attempting to vote," or for "urging or aiding" someone else in voting or attempting to do so. 52 U.S.C. § 10307(b).

3. Federal law also prohibits "armed men" in "the civil, military, or naval service of the United States" from being present "where a general or special election is held, unless such force be necessary to repel armed enemies of the United States." 18 U.S.C. § 592. This prohibition on the presence of armed officers at polling places has a lengthy pedigree in our common law tradition. *See* Statute of Westminster the First 1275, 3 Edw. 3 c. 5 (declaring that, "because

Elections ought to be free, the King commandeth upon great Forfeiture, that [no Man] by Force of Arms, nor by Malice, or Menacing, shall disturb any to make free Election.").

4. Notwithstanding federal law, and the traditional sanctity afforded to polling places, the Trump Administration has made clear by word and deed over the past year that it asserts the authority to dispatch armed officers to active polling locations.

5. In just the past few weeks, the leaders of two of the nation's largest law enforcement bodies—U.S. Immigration and Customs Enforcement ("ICE") and the Federal Bureau of Investigation ("FBI")—have provided statements confirming that their agencies stand willing and able to send agents into polling places ("Polling Place Policy").

6. Their confirmatory statements did not emerge from a vacuum. For months, officials in the Trump Administration—including some of the highest-ranking officials in the Department of Homeland Security ("DHS"), the Department of Justice ("DOJ"), and the White House—have previewed the existence of the Polling Place Policy through public remarks. When asked about the prospect of sending the National Guard or ICE to polling locations, President Trump himself responded that he would "do anything necessary" to hold what, in his view, constitutes an "honest election[]."[1]

7. But dispatching armed federal agents to the polls—*or even threatening to do so*—is forbidden by federal law. This is because voters need not actually be arrested, questioned, or even approached in order for such threats to intimidate them from exercising the franchise. For many lawful American voters, the sight of masked, armed federal agents in a polling-place parking lot is enough to send them home or make them think twice about casting a ballot at all. For many

[1] *Transcripts: Trump Leaves White House for His Trip to China*, CNN (May 12, 2026), https://transcripts.cnn.com/show/cnc/date/2026-05-12/segment/09?utm.

others, the mere prospect of such an encounter will keep them from heading to the polls. And because no voter can know in advance whether agents will be waiting at his or her polling place when they arrive to cast a ballot, the Polling Place Policy chills voting everywhere, not only where ICE and FBI agents actually appear.

8. The Policy falls hardest on voters most likely to fear an encounter with immigration enforcement. These include naturalized citizens, who may reasonably worry that agents will question their citizenship or eligibility at the polls. Some of these voters will not vote at all, particularly those who are intimidated too late to request a mail ballot, who do not qualify to vote by mail, or whose ballots are delayed in the mail. Others will vote only after bearing burdens no eligible voter should face. They may gather proof of citizenship before heading to the polls, arrange for others to accompany them, or search for reports of whether agents have been sighted at their polling site.

9. Plaintiffs—DSCC, DCCC, and Democratic Governors Association ("DGA"), and the Democratic leaders of the U.S. Senate and U.S. House of Representatives—are directly harmed by these threats. Their mission is to elect Democratic candidates to the U.S. Senate and U.S. House, and in gubernatorial races nationwide by supporting efforts to persuade and mobilize voters, and by protecting those voters' ability to cast ballots that count. Every Democratic-leaning voter intimidated into staying home is a vote lost to Democratic candidates. The Policy thus tilts the competitive environment in which those candidates, including the individual candidate Plaintiffs, seek elected office. It further requires Plaintiffs DSCC, DCCC, and DGA to divert their finite resources in the critical period right before the election in order to undertake costly efforts to staunch the harm caused by the Polling Place Policy.

10. Plaintiffs therefore seek declaratory and injunctive relief setting aside the Polling Place Policy and barring Defendants from stationing armed officers anywhere that votes are cast, collected, or counted.

**JURISDICTION AND VENUE**

11. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs assert federal law claims, including claims arising under the Administrative Procedure Act, 5 U.S.C. §§ 702–706, and the Voting Rights Act, 52 U.S.C. § 10307. They also seek relief pursuant to the Declaratory Judgment Act. *See* 28 U.S.C. § 2201.

12. Venue is proper under 28 U.S.C. § 1391 because all Defendants reside in this district and carry out their official duties in this district. Furthermore, a substantial part of the events giving rise to the claims occurred in this district.

**PARTIES**

13. Plaintiff DSCC, also known as the Democratic Senatorial Campaign Committee, is the Democratic Party's national senatorial committee. Its mission is to elect candidates of the Democratic Party across the country to the U.S. Senate. Like its fellow federal Democratic Party committees, DSCC pursues its mission by working with Democratic Senate candidates to encourage and assist Democratic Party members and supporters in successfully casting ballots. This mission requires preserving the legal rights of its members and voters who wish to successfully cast their ballots free from intimidation or coercion. DSCC's members include Democratic members of the U.S. Senate, as well as active Democratic candidates for U.S. Senate. DSCC currently has members in 44 States (every State except for Indiana, Missouri, Nebraska, North Dakota, South Dakota, and Utah). Beyond its formal membership, DSCC's constituency also includes Democratic voters and supporters in all 50 States. Both DSCC itself and DSCC's members, including its members who are Democratic candidates for office, are directly impacted

by the Polling Place Policy, which intimidates voters, significantly disrupts DSCC's campaign activity, and forces DSCC (and its members) to compete in unlawfully structured elections.

14. Plaintiff DCCC, also known as the Democratic Congressional Campaign Committee, is the Democratic Party's national congressional committee. Its mission is to elect candidates of the Democratic Party from across the country to the U.S. House of Representatives. Like its fellow Democratic Party committees, DCCC pursues its mission by working with Democratic congressional candidates and their campaigns to encourage and assist supporters of the Democratic Party in successfully casting ballots. This mission further requires preserving the legal rights of its members and voters who wish to successfully cast their ballots free from intimidation or coercion. DCCC's members include Democratic members of the U.S. House, as well as active Democratic candidates for U.S. House. DCCC currently has members in all 50 States. Beyond its formal membership, DCCC's constituency also includes Democratic voters and supporters, whose voting rights it seeks to protect. Both DCCC itself and DCCC's members, including its members who are candidates for office, are directly impacted by the Polling Place Policy, which intimidates voters, significantly disrupts DCCC's campaign activity, and forces DCCC (and its members) to compete in unlawfully structured elections.

15. Plaintiff DGA is a political organization dedicated to supporting Democratic governors and electing Democratic gubernatorial candidates across the United States. DGA works with Democratic gubernatorial candidates and campaigns, and provides funding to educate and communicate with Democratic voters; to encourage and assist supporters of the Democratic Party in successfully casting ballots; and to preserve the legal voting rights of its voters. DGA also supports Democratic incumbent governors by serving as a clearinghouse for best practices and policies, including for managing, administering, and budgeting for Federal, State, and local

elections. DGA's members include all incumbent Democratic governors—representing 24 States, Guam, and the U.S. Virgin Islands—as well as the Mayor of the District of Columbia. At least 10 incumbent Democratic governors are candidates for office in their respective States in the 2026 general election. Both DGA itself and DGA's members, including its members who are candidates for office, are directly impacted by the Polling Place Policy, which intimidates voters, significantly disrupts DGA's campaign activity, and forces DGA (and its members) to compete in unlawfully structured elections.

16. Plaintiff Charles E. "Chuck" Schumer is the senior U.S. Senator from New York and the leader of the Senate Democratic Caucus, presently serving as Senate Minority Leader. Leader Schumer is responsible for helping to elect Democratic Party candidates in U.S. Senate elections across the country. This responsibility is critical to the success of the Senate Democratic Caucus, as the caucus's ability to pass and influence legislation depends in significant part upon the size of its membership. Increasing the size of the Senate Democratic Caucus, both by electing new Democratic senators and reelecting incumbent Democratic senators, is therefore an essential part of Leader Schumer's mission and duties. Leader Schumer is often directly involved in campaigns across the country to elect Democratic senators, including in competitive battleground States. Relatedly, Leader Schumer works closely with DSCC and its leadership to help elect Democratic Senate candidates. Leader Schumer has been elected to the U.S. Senate five times and to the U.S. House of Representatives nine times prior to that. He is a candidate for the U.S. Senate in 2028 and is directly impacted by the Polling Place Policy in his own capacity as a candidate. As a voter himself in New York State, Leader Schumer is harmed by the Polling Place Policy, to the extent it permits armed federal agents to be dispatched to his polling place, or for Defendants to threaten as much.

17. Plaintiff Hakeem S. Jeffries is a member of the U.S. House of Representatives from the Eighth Congressional District of New York. He is the leader of the House Democratic Caucus and presently serves as House Minority Leader. Leader Jeffries is responsible for helping to elect Democratic Party candidates in congressional elections across the country. This responsibility is critical to Leader Jeffries' ability to serve as an effective leader of the House Democratic Caucus, as increasing the size of the Caucus is central to improving its ability to pass and influence legislation, and its ability to pursue the mission and platform of the Democratic Party. To that end, Leader Jeffries is directly involved in helping Democratic congressional candidates to campaign in races across the country, including in key battleground districts that often resolve which party controls the House of Representatives. He is up for reelection in the upcoming 2026 midterm elections and is therefore also directly impacted by the Polling Place Policy in his own capacity as a candidate. He also works closely with DCCC and its leadership to help elect Democratic congressional candidates. Leader Jeffries has been elected seven times to the U.S. House of Representatives. As a voter himself in New York State, Leader Jeffries is harmed by the Polling Place Policy, to the extent it permits armed federal agents to be dispatched to his polling place, or for Defendants to threaten as much.

18. The U.S. Department of Homeland Security ("DHS") is a federal agency headquartered in Washington, D.C. Defendant Markwayne Mullin is the Secretary of Homeland Security and is sued in his official capacity.

19. U.S. Immigration and Customs Enforcement ("ICE") is a federal agency within DHS headquartered in Washington, D.C. Defendant David Venturella is the Acting Director of ICE and is sued in his official capacity.

20. The Federal Bureau of Investigation ("FBI") is a federal agency within the Department of Justice headquartered in Washington, D.C. Defendant Kashyap "Kash" Patel is the Director of the FBI and is sued in his official capacity.

## STATEMENT OF LAW AND FACTS

### I. Federal law guarantees that voters can go to the polls without fear of intimidation from armed federal officers.

21. Congress has stated in no uncertain terms that armed federal officers are not permitted at polling places and that voters cannot be subject to intimidation, threats, or coercion as they prepare to cast their votes.

22. In the 1860s and 1870s, Congress passed a series of laws restricting the ability of the Executive Branch to station armed officers at polls. Among those statutes was the predecessor to 18 U.S.C. § 592, which currently provides:

> Whoever, being an officer of the Army or Navy, or other person in the civil, military, or naval service of the United States, orders, brings, keeps, or has under his authority or control any troops or armed men at any place where a general or special election is held, unless such force be necessary to repel armed enemies of the United States, shall be fined under this title or imprisoned not more than five years, or both; and be disqualified from holding any office of honor, profit, or trust under the United States.

23. At the time the original statute was passed, it also permitted use of troops or armed men "to keep the peace at the polls." Act of Feb. 25, 1865, ch. 52, 13 Stat. 437. But the text was amended in 1909 to remove that language, which the Committee felt served "no good purpose," 43 Cong. Record 3736 (1909), and has remained in essentially the same form ever since.

24. That statute, alongside the Posse Comitatus Act, 18 U.S.C. § 1385, and 18 U.S.C. § 593, which sets out a list of actions related to elections that federal troops are prohibited from engaging in, represents an express statutory prohibition against the presence of armed federal

officers at the polls except as "necessary to repel *armed enemies of the United States*." 18 U.S.C. § 592 (emphasis added).

25. Congress has also prohibited voter intimidation at the polls in no uncertain terms, beginning with the Ku Klux Klan Act of 1871 (the "Klan Act"). The Klan Act prohibits private actors from engaging in conspiracies to intimidate voters. *See* 42 U.S.C. § 1985(3).

26. Congress reaffirmed its commitment to outlawing voter intimidation with the passage of the Civil Rights Act of 1957. The statute, now codified at 52 U.S.C. § 10101(b), prohibited any person from intimidating voters, or attempting to intimidate voters, "for the purpose of interfering with [the right to vote]."

27. Several years later, Congress passed § 11(b) of the Voting Rights Act, which states in relevant part: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote . . . ." 52 U.S.C. § 10307(b).

28. By its plain text, § 11(b) removed the requirement that plaintiffs demonstrate a specific purpose to intimidate voters found in the Civil Rights Act. In testimony before the Senate Judiciary Committee, then-Attorney General Katzenbach explained that § 11(b) "represents a substantial improvement over" the Civil Rights Act. *Voting Rights: Hearings on S. 1564 Before the S. Comm. on the Judiciary*, 89th Cong., pt. 1, at 16 (1965). As Katzenbach explained, "[u]nder [the VRA] no subjective 'purpose' need be shown, in either civil or criminal proceedings, in order to prove intimidation . . . . Rather, defendants would be deemed to intend the natural consequences of their acts." *Id.* The House Report adopted this reasoning, explaining that "[t]he prohibited acts of intimidation need not be racially motivated; indeed, unlike [the Civil Rights Act] (which

requires proof of a 'purpose' to interfere with the right to vote) no subjective purpose or intent need be shown." H.R. Rep. No. 89-439 at 30 (1965).

29. A plaintiff bringing a claim under § 11(b) therefore need not show that the defendant has any specific, purposeful intent to intimidate voters (against voters of color or otherwise) to demonstrate a violation of § 11(b). The legal test is instead whether the defendant's conduct is objectively intimidating or threatening to voters.

30. Courts have regularly found that armed individuals—and threats of armed individuals—at polls are intimidating. *See, e.g.*, *Allen v. City of Graham*, No. 1:20-CV-997, 2021 WL 2223772, at *7 (M.D.N.C. June 2, 2021); *Council on Am.-Islamic Rels.-Minn. v. Atlas Aegis, LLC* ("*CAIR-Minn.*"), 497 F. Supp. 3d 371, 379 (D. Minn. 2020); *United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965).

31. Indeed, the Republican National Committee entered into a consent decree with the Democratic National Committee in 1981 after intimidating voters on election day by posting off-duty sheriffs and police officers, some of whom were armed, at polling places in precincts with minority voters. *See Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 579, 622 (D.N.J. 2009) (declining to vacate Consent Decree), *aff'd*, 673 F.3d 192 (3d Cir. 2012).

32. But intimidation also need not be so explicit in order to violate § 11(b); it can instead be a "subtle form[] of pressure." *Voting Rights: Hearing Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 89th Cong. 11 (1965) (statement of Nicholas B. Katzenbach, Att'y Gen. of the U.S.). Courts have also found that statements that may dissuade individuals from voting fall within the ambit of voter intimidation. *See, e.g.*, *Nat'l Coal. on Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78, 112–13 (S.D.N.Y. 2023) (finding that robocall suggesting voter information would be collected by and used by police and debt collectors was intimidation); *CAIR-Minn.*, 497

F. Supp. 3d at 375, 378 (statements to press that private security firm would be sending armed agents to polls constituted voter intimidation).

33. The plain text of 18 U.S.C. § 592 as well as § 11(b) of the Voting Rights Act are undeniably clear: armed federal officers at polls, in the absence of "armed enemies of the United States," and acts that "intimidate, threaten, or coerce any person for voting or attempting to vote" are barred by statute.

## II. Defendants have established a policy of sending armed officers into polling places.

### A. The President and other Defendants confirm the existence of a policy permitting the dispatch of armed officers into polling places.

34. Over the past year, Defendants have demonstrated by word and deed that they have established a policy of permitting their armed officers to appear at active polling sites.

35. On February 2, 2026, President Trump—in an interview with former FBI Deputy Director Dan Bongino—announced that Republicans "should take over the voting" and "ought to nationalize the voting" ahead of the 2026 midterms.[2] The very next day, Steve Bannon—a prominent former advisor to President Trump—declared, "We're going to have ICE surround the polls come November. . . . We're not going to sit here and allow you to steal the country again."[3]

36. On February 5, 2026, just a few days after President Trump's command to "nationalize" the elections, White House Press Secretary Karoline Leavitt was asked whether ICE

[2] Walter Olson, *"We Should Take Over the Voting . . . Nationalize the Voting,"* Cato Inst. (Feb. 3, 2026), https://www.cato.org/blog/we-should-take-over-voting-nationalize-voting.

[3] Phillip M. Bailey, *'Surround the Polls': ICE Will Patrol Elections, Ex-Trump Aide Says*, USA Today (Feb. 4, 2026), https://www.usatoday.com/story/news/politics/2026/02/04/ice-patrol-polls-2026-donald-trump-steve-bannon/88510175007/.

agents would be sent to polling places. She responded that she could not "guarantee that an ICE agent won't be around a polling location in November."[4]

37. On March 18, 2026, current Secretary of Homeland Security Markwayne Mullin appeared before the Committee on Homeland Security for his confirmation hearing. During the hearing, Mullin was asked "[D]o you feel you have the authority to put uniformed officers at polling locations in 2026?"[5] Mullin confirmed that he believed he had such authority, stating that officers could be deployed to polling places "if there was a specific threat for them to be there."[6] When pressed on what circumstances would legally permit such deployment Mullin refused to "guarantee hypothetically of what threat" would suffice. Nonetheless, he confirmed the prospect of deploying ICE officers, stating his view that, in a scenario where ICE agents are deployed to the polls, "[t]here will be a reason for us to be there, and it will be known why we are there."

38. The next month, Tom Homan—the White House's so-called "Border Czar" and a former acting director of ICE—appeared on The Charlie Kirk Show and stated that "part of DHS's job is [to] secure elections."[7] When asked if that meant ICE agents might be deployed to the polls,

[4] Andrew Feinberg, *White House's Chilling Warning About Midterm Elections: 'Can't Guarantee an ICE Agent Won't Be Around Polling Locations*,*'* Independent (Feb. 5, 2026), https://www.the-independent.com/news/world/americas/us-politics/white-house-midterms-2026-warning-ice-b2914933.html.

[5] *Nomination of Hon. Markwayne Mullin: Hearing Before the S. Comm. on Homeland Sec. & Gov't Affs.*, 119th Cong. (2026), https://www.govinfo.gov/content/pkg/CHRG-119shrg63380/pdf/CHRG-119shrg63380.pdf.

[6] *Id.*

[7] *Voting Officials Fear DHS May Actually Be a Threat to Elections this Year*, NPR (June 16, 2026), https://www.npr.org/transcripts/nx-s1-5702491.

he responded: "I mean, bottom line is, what are they afraid of? They say illegal aliens don't vote . . . But if only U.S. citizens can vote, I don't see the issue."[8]

39. Two days later, then-Deputy Attorney General—and present Attorney General—Todd Blanche made clear the Administration had no reluctance to sending ICE agents to polling locations. On March 26, 2026, in remarks to a crowd at the Conservative Political Action Conference, he rhetorically asked: "Why is there objection to sending ICE officers to polling places? Illegals can't vote."[9]

40. On May 12, 2026, a reporter directly asked the President whether he would "send the National Guard or ICE [agents] to voting locations in November." Trump responded that he would "do anything necessary to make sure we have honest elections."[10]

41. In the wake of these statements, in June 2026, the Department of Justice removed from its website a longstanding manual for prosecuting election crimes.[11] The manual makes clear in several instances that federal law prohibits dispatching "any" "officer or employee of the United

---

[8] *Id.*; *see also* Joe Kent & Tyler Robinson, The Charlie Kirk Show (independently recorded Mar. 24, 2026), https://omny.fm/shows/the-charlie-kirk-show/joe-kent-and-tyler-robinson.

[9] Nicole LaFond, Hunter Walker & Josh Kovensky, *Now Trump Officials Are Choosing to Talk About ICE at the Polls*, Talking Points Memo (Mar. 26, 2026), https://talkingpointsmemo.com/where-things-stand/now-trump-officials-are-choosing-to-talk-about-ice-at-the-polls.

[10] *Trump Leaves White House for His Trip to China*, *supra* note 1.

[11] Joe Sommerlad, *DOJ Quietly Scraps 'Command Center' that Would Help Monitor 2026 Election Integrity, Report Says*, Independent (June 8, 2026) https://www.the-independent.com/news/world/americas/us-politics/doj-command-center-election-integrity-trump-b2991875.html; Press Release, *Padilla, Durbin, Whitehouse, Colleagues Sound Alarm on Trump Administration Use of Election Crimes Prosecutions to Interfere in Midterm Elections* (June 8, 2026), https://www.padilla.senate.gov/newsroom/press-releases/padilla-durbin-whitehouse-colleagues-sound-alarm-on-trump-administration-use-of-election-crimes-prosecutions-to-interfere-in-midterm-elections/.

States Government" to "any polling place in any election."[12] In tandem with this move, DOJ declined to establish its usual "command center" for addressing election day emergencies and cancelled routine election training sessions for federal prosecutors and FBI agents.[13]

42. On September 1, 2026, Secretary Mullin again confirmed that DHS remains willing to send ICE agents to polling locations, federal law notwithstanding. At a press conference in New York City, he stated:

> The only reason why we would be at polling places is if there is a threat to that polling place or we're serving a warrant on someone that we have been actively tracking down . . . ICE's job is immigration, customs enforcement. That's their job . . . if we're serving a warrant we will be where we need to be.[14]

43. A DHS spokesperson later built upon Mullin's statement, explaining: "ICE conducts intelligence-driven targeted enforcement, and if an active public safety threat endangered a polling location, they may be arrested as a result of that targeted enforcement action."[15]

44. DHS's most recent statements confirm the existence of an agency policy that authorizes sending ICE officers to polling locations, so long as the agency either identifies a supposed "threat," is seeking to serve a warrant, or is engaged in routine immigration enforcement activities.

---

[12] Richard C. Pilger, Pub. Integrity Section, *Federal Prosecution of Election Offenses* 23–25 (2017) https://electionjudgments.org/api/files/15950091773541o6uhighakw.pdf; *see also id.* at 73 ("Section 592 prohibits the use of official authority to order armed personnel to the polls . . . ."); at 86 ("In fact, federal law provides criminal penalties for any federal official who sends 'armed men' to open polling locations."); *id.* at 117 (noting § 592 "prohibits federal officials from stationing armed men at places where elections are in progress").

[13] *Id.*

[14] Eric Bazail-Eimil, *Mullin Says DHS Could Deploy to Polling Sites for 'Specific' Threats, Arrests*, Politico (Sep. 1, 2026), https://www.politico.com/news/2026/09/01/mullin-says-dhs-could-deploy-to-polling-sites-for-specific-threats-arrests-01060040.

[15] *Id.*

45. The FBI has similarly revealed that its agents stand ready to enter polling places at the Director's whim. During FBI Director Kashyap "Kash" Patel's September 15, 2026 testimony before the Senate Judiciary Committee, he was asked by Senator Blumenthal whether he would "commit that [he] will not send FBI agents to the polls."[16] Patel responded that "[i]f there's a reason to go there because there's been a violation of the law, we will[.]"[17] Patel gave this response even though he testified earlier in the same hearing that he was "aware" of the "Justice Department's long-standing guidance that states that FBI agents cannot conduct investigations inside polling places on Election Day."[18]

46. Senator Welch later picked up on this line of questioning, asking whether it had been the Director's understanding that the FBI would not "be sending people to the polls."[19] Patel responded: "When did you hear that? Just another lie."[20] Senator Welch therefore followed up by straightforwardly asking Patel: "So you are sending F.B.I. agents to the polls?"[21] Patel responded equivocally, stating "Election integrity is of paramount importance. This F.B.I. will not shy away from that effort."[22] Senator Welch again directly asked whether Patel would "pledge that you will not in any way interfere in the will of the American people when they go to the polls in

---

[16] Jose Pagliery, *Kash Patel Won't Promise to Keep FBI Agents Away From Polling Places*, Wash. Sun (Sep. 15, 2026), https://www.washingtonsun.com/policy/patel-fbi-agents-polling.

[17] *Id.*

[18] *Id.*

[19] Devlin Barrett, *Patel Suggests F.B.I. Agents May Be Sent to the Polls*, N.Y. Times (Sep. 15, 2026), https://www.nytimes.com/2026/09/15/us/politics/patel-fbi-agents-election.html.

[20] *Id.*

[21] *Id.*

[22] *Id.*

November?"[23] Patel responded: "I pledge unequivocally that I will not participate in your charade of lies."[24]

47. Accordingly, the FBI Director has publicly confirmed that his own agency has adopted a position similar to DHS's Polling Place Policy.

**B. Federal agents have unlawfully entered polling locations, lingered outside of the polls within view of voters, and raided election offices.**

48. Consistent with Defendants' public statements, ICE began appearing at the polls during primary and runoff elections held earlier this year.

49. On May 20, 2026, nine ICE officers "swarmed" a vehicle in the parking lot of a voting location in San Antonio, Texas, within view of people heading to the polls.[25] The Bexar County Sheriff later arrived on the scene and told the ICE agents to vacate the polling area.[26]

50. On June 2, 2026, several vehicles containing a number of ICE agents, including at least one officer wearing a mask and bulletproof vest, appeared at a polling location in Simi Valley, California, and lingered in the parking lot outside for approximately 30 minutes.[27]

---

[23] *Id.*

[24] *Id.*

[25] Michael Karlis, *ICE Conducts Enforcement Action at San Antonio Voting Location, Witnesses Say*, San Antonio Current (May 20, 2026), https://www.sacurrent.com/news/san-antonio-news/ice-conducts-enforcement-action-at-san-antonio-voting-location-witnesses-say/.

[26] *Id.*

[27] Wes Woods II, *UPDATED: ICE Presence Outside Simi Valley Vote Center Raises Alarms*, Ventura Cnty. Star (June 3, 2026), https://www.vcstar.com/story/news/politics/elections/2026/06/02/ice-presence-outside-simi-valley-vote-center-raises-alarms/90378216007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z119446p11xx50l118150c11xx50e003100v119446d--53--b--53--&gca-ft=150&gca-ds=sophi; *ICE Presence Outside Simi Valley Vote center Raises Alarms*, Ventura Cnty. Star (June 2, 2026), https://www.vcstar.com/videos/news/politics/elections/2026/06/02/ice-agents-outside-simi-valley-vote-center/90379756007/.

51. On June 23, 2026, several ICE agents entered a polling location in Syracuse, New York, to confront an election worker who had previously criticized ICE on her personal Instagram account.[28] The Republican elections commissioner for Onondaga County, in which Syracuse is located, later criticized ICE's entry into the polling location, stating: "There was no emergency. They weren't investigating an ongoing crime. There was no threat to public safety."[29] His Democratic counterpart stated that "people [we]re scared" by ICE's appearance at the polls.[30]

52. While FBI agents have not yet appeared at active polling locations, on January 28, 2026, the FBI dispatched a large contingent of agents to the elections office in Fulton County, Georgia to collect hundreds of boxes of ballot material from the 2020 election.[31]

**C. Ongoing FOIA litigation suggests the existence of a Polling Place Policy.**

53. In March 2026, the Democratic National Committee ("DNC") filed suit against various federal agencies—including the Department of Justice, FBI, and ICE, among others—to enforce a FOIA request seeking records "concerning potential deployment of federal agents and troops to polling places, drop boxes, and election offices." Complaint ¶ 1, *Democratic National Committee v. Department of Justice* ("*DNC*"), No. 1:26-CV-825-BAH (D.D.C. Mar. 10, 2026), ECF No. 1.

---

[28] Natalie Mooney, *Syracuse Poll Worker Says ICE Agents Targeted Her at Primary Election Polling Place*, Spectrum News (June 25, 2026), https://spectrumlocalnews.com/nys/central-ny/news/2026/06/25/ice-agents-at-syracuse-poll.

[29] Jacob Knutson, *Election Officials Express Alarm After ICE Confronts Poll Worker Over Social Media Post*, Democracy Docket (June 26, 2026), https://www.democracydocket.com/news-alerts/new-york-election-officials-immigration-agent-confronts-poll-worker/.

[30] *Id.*

[31] Hannah Rabinowitz, et al., *FBI Searches Fulton County Elections Office as it Investigates Alleged voter fraud*, CNN (Jan. 28, 2026), https://www.cnn.com/2026/01/28/politics/fulton-county-election-office-fbi-warrant.

54. In the parties' first Joint Status Report, ICE indicated that it had "completed its searches and did not locate any responsive records." *See* Joint Meet and Confer Report at 5, *DNC*, No. 1:26-CV-825-BAH (D.D.C. May 22, 2026), ECF No. 20. But after the DNC pointed to Secretary Mullin's testimony regarding the deployment of ICE agents, as well as the instances noted above where ICE agents appeared at active polling locations, *see* Joint Status Report at 4, *DNC*, No. 1:26-CV-825-BAH (D.D.C. July 10, 2026), ECF No. 22, ICE conducted an expanded search and reported that it had identified 11,103 potentially responsive records that would take it approximately 22 months to review and produce. *See id.* at 4–5. As of August 21, 2026, ICE indicated it would produce "less than 20% of its remaining potentially responsive records prior to Election Day." *See* Joint Status Report at 2, *DNC*, No. 1:26-CV-825-BAH (D.D.C. Aug. 21, 2026), ECF No. 25.

55. The most recent Joint Status Report in the *DNC* FOIA litigation reflects that ICE has improperly withheld at least one document—titled "Checklist for Law Enforcement Voter Integrity 9.15.25 - FINAL DRAFT -- BSI suggestions.docx"—that was an attachment to an earlier produced email. *See* Joint Status Report at 1–2, *DNC*, No. 1:26-CV-825-BAH (D.D.C. Sep. 18, 2026), ECF No. 28. ICE neither logged this document on its *Vaughn* Index, nor sent it to DOJ for consultation—it simply failed to produce it or assert a proper exemption, notwithstanding the significant public interest in this document. Moreover, the September 18 Joint Status Report reflects that ICE continues to produce mostly unannotated public news clippings, despite having thousands of additional documents in its possession that are of significant public concern.

56. ICE's delay and obfuscation in the *DNC* FOIA litigation are indicative of its broader effort to deny and conceal the existence of the Polling Place Policy, notwithstanding the

apparent existence of thousands of documents within the agency's possession that are potentially responsive to its deployment of armed officers to polling locations.

**D. The Polling Place Policy fulfills the President's frequently expressed desire to "nationalize the voting."**

57. The Polling Place Policy did not emerge in a vacuum. It is part and parcel with various executive initiatives announced by President Trump that have sought to usurp authority for the Executive Branch to influence and ultimately control the nation's elections. *See, e.g.*, Exec. Order No. 14,248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14,005 (Mar. 28, 2025); Exec. Order No. 14,399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17,125 (Apr. 3, 2026); *see also* Press Release, U.S. Dep't of Just. Off. of Pub. Aff., *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sep. 25, 2025), https://perma.cc/43HD-HR54.

58. Federal courts have enjoined or dismissed these efforts in substantial measure, recognizing that they assert unlawful authority that Congress has never granted the Executive Branch. *See, e.g.*, Order, *USPS v. California*, No. 26A305 (U.S. Sep. 14, 2026) (denying application to stay preliminary injunction of EO 14,399 because the "Government is unlikely to succeed on the merits"); *DSCC v. Trump*, No. 1:26-CV-1114-CJN, 2026 WL 2681471 (D.D.C. Sep. 13, 2026) (similar); *League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 1:25-CV-946-CKK, 2026 WL 880056, at *1–3 (D.D.C. Mar. 31, 2026) (enjoining broad portions of Executive Order No. 14,248), *appeal docketed*, No. 26-5098 (Mar. 31, 2026); *Washington v. Trump*, 814 F. Supp. 3d 1173 (W.D. Wash. 2026) (similar), *appeal docketed*, No. 26-1429 (9th Cir. Mar. 3, 2026); *California v. Trump*, 786 F. Supp. 3d 359 (D. Mass. 2025) (similar), *appeal docketed*, No. 25-1726 (1st Cir. Aug. 1, 2025); *see also United States v. Evans*, No. 1:25-CV-4403-RDM, 2026 WL 2267774, at *5 & n.4 (D.D.C. Aug. 6, 2026) (observing that "twenty district

courts and the Sixth Circuit" had dismissed lawsuits brought by the Department of Justice seeking state voter rolls), *appeal docketed*, No. 26-5296 (D.C. Cir. Aug. 19, 2026). The Polling Place Policy is therefore the latest in a string of unlawful, so-called "election integrity" measures pursued by the Trump administration.

**III. Plaintiffs, their candidates, and voters are harmed by the Polling Place Policy.**

59. The Polling Place Policy creates a culture of fear that discourages voters from exercising the franchise, thereby harming Plaintiffs, who work to turn out voters and who, along with their candidate members, ultimately depend on these voters to win elections.

60. Inevitably, many prospective voters who encounter armed federal agents at their polling site will cancel their plans to vote and go home rather than risking a confrontation. Further, once a voter is aware of the Polling Place Policy, the suppressive effect will ensue regardless of whether federal agents are actually deployed to that voter's polling place. The mere prospect of encountering armed federal agents—combined with the fact that voters will likely be unable to confirm that federal armed agents are *not* present—is sufficient to intimidate many voters into staying home.

61. These concerns are not hypothetical. Plaintiffs and their candidate members have heard from voters who have expressed fear about the presence of federal armed agents, including ICE agents, at the polls, and fear that they will be personally targeted if they show up to vote in person. Local election officials have echoed these concerns.

62. The Polling Place Policy will disenfranchise voters entirely if they are unwilling or unable to vote by mail. Indeed, there are many reasons why voters may not be able to successfully cast a ballot by mail, including because it is too late to request a mail ballot at the time that a voter is intimidated by the Polling Place Policy (which includes all intimidation that occurs on election day itself), or because a voter does not fall within a State's criteria for voting by mail, or because

there are United States Postal Service delays in returning a mail ballot to local election officials on time.

63. And many voters who still decide to vote in person will inevitably suffer burdens in response to the Polling Place Policy. For example, in response to potential ICE presence at polling locations, voters may delay going to the polls until they are able to gather documentation proving their citizenship, which for many voters can be extremely difficult. Concerned voters will similarly delay voting until they are able to devise a plan to avoid confrontation or obtain assistance from others. Voters may also expend considerable effort trying to discern if ICE or other armed federal agents have, in fact, been deployed to their polling site.

64. These burdened (and potentially disfranchised) voters will undoubtedly include many supporters of Plaintiffs DSCC's, DCCC's and DGA's candidate members, including Plaintiffs Schumer and Jeffries. Plaintiffs work tirelessly to protect the voting rights of their supporters, and both these voters and Plaintiffs suffer injury when those rights are impeded.

65. Moreover, the Polling Place Policy will disproportionately affect Democratic-leaning voters. The Trump administration has made plain that it is willing to wield power to achieve partisan goals on behalf of the Republican Party and its candidates, *see supra* § II.D., and the presence of armed federal agents is particularly threatening and concerning to voters who are inclined to support Democratic candidates, including Plaintiffs' candidate members. Additionally, data indicates that naturalized citizens, who may be particularly wary of encounters with armed ICE agents who may falsely question their citizenship or eligibility to vote, are more likely to vote for Democratic candidates.

66. The Polling Place Policy separately harms Plaintiffs by forcing them to attempt to alleviate voter intimidation and suppression through revised programming and messaging, which naturally requires resource diversion from other mission critical activities.

67. Plaintiffs DSCC, DCCC and DGA's core business includes persuading and mobilizing voters to support their candidate members. Accordingly, DSCC, DCCC, and DGA have invested heavily in encouraging their supporters to vote, including significant sums already spent on turnout efforts for the 2026 election. DSCC, DCCC and DGA, however, had developed their get-out-the-vote strategies and messaging with the expectation that polling places will be free from the unlawful and unprecedented intimidation, as required by law. Because of the Polling Place Policy and Defendants' ongoing threats, DSCC, DCCC and DGA are forced to revise their communications and voter engagement efforts at the last minute to support and protect voters who are concerned about confronting federal agents at the polls.

68. DSCC, DCCC, and DGA have also invested heavily in voter protection initiatives to ensure that voters can successfully cast their ballots. DCCC, for instance, has devoted considerable financial resources and staff time to on-the-ground voter protection, including through coordination with candidate members' campaigns across the country. DSCC and DGA have provided financial support to many similar programs. But although obstacles to voting are nothing new, the Polling Place Policy certainly is. With the threat of federal armed agents hanging over the 2026 elections, DSCC, DCCC, and DGA's existing efforts are compromised and undermined. DSCC, DCCC, and DGA must spend additional resources to help train staff and volunteers to account for the Polling Place Policy, including how they should respond if federal armed agents interact with, challenge, or even arrest voters at polling places. They must also work

to ensure that legal monitors are prepared to object to the presence of federal armed agents, and to address direct efforts by federal agents to suppress or otherwise question voters.

69. In addition to revising their existing programs, DSCC, DCCC, and DGA must develop or invest in new programs. These new initiatives include, for example, programming that monitors the presence of federal armed agents at polling places and communicates sightings to their candidate members' campaigns and potential voters. They will also include programs to ensure that voters feel comfortable voting in person, including providing opportunities for volunteers to accompany voters to polling places, and assistance in identifying and obtaining the type of documentation that would allow a voter to prove citizenship if questioned.

70. Changes to DSCC's, DCCC's, and DGA's plans at this stage, which will need to be implemented across the country, requires diverting resources from other much needed programs. Thus, the financial resources and staff time that must be devoted to responding to the Polling Place Policy inevitably interferes with Plaintiffs' critical activities and expenditures. *See Ctr. for Taxpayer Rts. v. IRS*, No. 26-5006, 2026 WL 2635380, at *5 (D.C. Cir. Sep. 8, 2026) ("[W]here, as here, a government action 'directly affect[s] and interfere[s] with' an organization's 'core business activities,' and the organization 'diverted its resources' to continue pursuing those activities, such concrete harm to the organization's activities supports standing to sue.") (alterations in original) (citation omitted).

71. Plaintiff Schumer suffers many of the same injuries as DSCC, DCCC, and DGA, including individually as a candidate and in his role as Leader of the Senate Democratic Caucus. Leader Schumer is responsible for helping to elect Democratic Party candidates in U.S. Senate elections across the country, and accordingly, he closely coordinates with DSCC and their candidate members to craft messaging, prioritize party investments, and develop strategies to elect

Democratic Senate candidates. The Polling Place Policy and Defendants' ongoing threats make Leader Schumer's efforts to grow the Senate Democratic Caucus more difficult by intimidating voters—including his constituents—and therefore interfering with planning and programming for Democratic Senate campaigns, as well as harming those campaigns' ultimate likelihood of success.

72. Plaintiff Jeffries likewise suffers those injuries as a candidate for reelection this cycle, and in his role as Leader of the House Democratic Caucus. Leader Jeffries works to elect Democratic Party candidates in U.S. House elections across the country, including through coordination with DCCC. The Polling Place Policy, along with Defendants' ongoing threats, make Leader Jeffries' efforts to grow the House Democratic Caucus more difficult by intimidating voters—including his constituents—and therefore interfering with planning and programming for Democratic House campaigns, as well as harming those campaigns' ultimate likelihood of success.

## CLAIMS FOR RELIEF

### COUNT I: VIOLATION OF THE APA
### 5 U.S.C. § 706(2)(A), 18 U.S.C. § 592; 52 U.S.C. § 10307(b)
### (All Defendants)

73. Plaintiffs incorporate each Paragraph above as if set forth fully herein.

74. Defendants have confirmed through their actions and their public statements—including sworn congressional testimony—that they have adopted a Polling Place Policy that authorizes armed federal officers, including ICE and FBI agents, to go to locations where ballots are cast and counted during the 2026 elections.

75. Secretary Mullin's public statements declaring that ICE officers have the authority to go to polling places as necessary for routine immigration and customs enforcement, as well as FBI Director Patel's recent statements during testimony before the Senate Judiciary Committee, refusing to state that FBI agents will not be present at polling locations—and expressly denying the suggestion that FBI would not deploy agents to the polls—confirm the existence of final agency

action under 5 U.S.C. § 704. *See Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020).

76. ICE and FBI agents are required to be armed when on duty.[32]

77. Sending armed officers to polling locations is contrary to multiple federal statutes, including 18 U.S.C. § 592, which prohibits federal armed officers at "any place where a general or special election is held, *unless such force be necessary to repel armed enemies of the United States,*" *id*. (emphasis added), and § 11(b) of the Voting Rights Act, which provides that "no person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote" or for "urging or aiding any person to vote or attempting to vote," 52 U.S.C. § 10307(b).

78. Because the Polling Place Policy directly conflicts with these unambiguous statutory commands, the Policy is "not in accordance with law" and must be set aside pursuant to the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

**COUNT II: VIOLATION OF THE VOTING RIGHTS ACT**
**52 U.S.C. § 10307(b)**
**(All Defendants)**

79. Plaintiffs incorporate each Paragraph above as if set forth fully herein.

80. Section 11(b) of the Voting Rights Act further provides that "no person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce . . . any person for voting or attempting to vote," nor shall they "attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b). Section 11(b) "is to be given an expansive

[32] Immig. & Customs Enf't, Directive 19009.3, Firearms and Use of Force at 8 (May 26, 2023) https://www.ice.gov/doclib/policy/19009.3.pdf; U.S. Dep't of Just. Off. of the Inspector Gen., Audit of the Federal Bureau of Investigation's Controls over Weapons, Munitions, and Explosives at 1 (Mar. 2020), https://oig.justice.gov/sites/default/files/reports/a20041.pdf.

meaning," *Jackson v. Riddell*, 476 F. Supp. 849, 859 (N.D. Miss. 1979), and incorporates the comprehensive definition of "vote" and "voting" in Section 14 of the Voting Rights Act, 52 U.S.C. § 10310(c)(1).

81. Establishing a violation of this provision does not require either "a showing of specific intent or racial animus[.]" *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.*, No. 1:18-CV-423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018). Furthermore, "threats, intimidation or coercion may take on many forms," *Nat'l Coal. on Black Civic Participation v. Wohl* ("*Wohl I*"), 498 F. Supp. 3d 457 (S.D.N.Y. 2020) (quoting *United States v. Beaty*, 288 F.2d 653, 656 (6th Cir. 1961) (per curiam)), and whether challenged activity is intimidating, coercive, or threatening "must be considered against the background of contemporaneous events . . . and the general climate prevailing . . . at the time." *United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967). "The threatened injury need not be one of violence or bodily harm," and "threats of economic harm, legal action, dissemination of personal information, and surveillance can qualify depending on the circumstances." *Wohl I*, 498 F. Supp. 3d at 477. Just as "[t]he presence of armed 'guards' at the polls" is "certainly likely to intimidate voters," *CAIR-Minn.*, 497 F. Supp. 3d at 379, 381 (enjoining under § 11(b) a private security firm's poll monitoring activities), the threat of deploying armed guards likewise results in voter intimidation.

82. The Polling Place Policy, under which armed federal officers may be sent to polls, is objectively likely to intimidate voters from voting or attempting to vote, or from urging or aiding others in voting, in violation of § 11(b) of the Voting Rights Act. It also threatens and coerces voters who plan to cast their ballot in person at a polling place, forcing some to abandon those plans entirely.

83. Likewise, Defendants' statements about sending armed federal officers to the polls are in and of themselves objectively likely to intimidate voters in violation of § 11(b) of the Voting Rights Act. Defendants have repeatedly been offered the opportunity to disavow any plans to send armed federal officers to polling locations. Each time, they have refused to state clearly that federal officers will not be present at polls during the 2026 general election.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Declare the Polling Place Policy unlawful;

B. Further declare that Defendants lack lawful authority to order, bring, keep, or maintain armed officers at any place where a general or special election is held;

C. Set aside the Polling Place Policy as not in accordance with law;

D. Declare that Defendants have engaged in conduct violating § 11(b) of the Voting Rights Act;

E. Enjoin Defendants from carrying out the Polling Place Policy, including by operating or carrying weapons in the vicinity of open polling places, including drop boxes, curbside voting locations, and any similar places where votes are taken, collected, received, counted, or certified during early voting periods, on election day itself, and, during any post-election day ballot curing period for any reason not authorized by law, and from threatening to engage in any such action.

F. Award costs and reasonable attorneys' fees incurred in this action; and

G. Grant such other relief as the Court deems just and proper.

Dated: September 23, 2026

Respectfully submitted,

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta (DC 975323)
Christopher D. Dodge (DC 90011587)
Julianna D. Astarita (DC 90041368)
Kevin R. Kowalewski (DC 90045467)
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 948-1135
unkwonta@elias.law
cdodge@elias.law
jastarita@elias.law
kkowalewski@elias.law

*Counsel for Plaintiffs DSCC, DCCC, Democratic Governors Association, U.S. Senate Minority Leader Schumer, and U.S. House Minority Leader Jeffries*